No. 19,053

ALBERT JOSEPH KOSTAL AND ARTHUR JEROME WATSON
*v.* PEOPLE OF THE STATE OF COLORADO.
(357 P. [2d] 70)

Decided November 28, 1960.

Messrs. HACKETHAL & McNEIL, for plaintiff in error Albert Joseph Kostal.

Messrs. BRADLEY, CARNEY & JOHNSON, for plaintiff in error Arthur Jerome Watson.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. GERALD HARRISON, Assistant, for defendant in error.

*En Banc.*

MR. JUSTICE MOORE delivered the opinion of the court.

WE refer to plaintiffs in error as defendants, or by name. An information was filed in the trial court in which defendants were accused of the crime of first

degree murder following the killing of one Raymond Earl Isley during a robbery committed in Jefferson county December 9, 1956. They were convicted and sentenced to death. They seek reversal of the judgment by writ of error.

Watson was arrested by federal officers in Detroit, Michigan, December 26, 1956. January 2, 1957, Kostal was arrested in Kansas City, Missouri, by federal officers and city police. At the time of their arrests defendants were fugitives from justice having escaped from Folsom prison on November 21, 1956. They were not then suspects in connection with the Jefferson county crime and were not questioned with relation thereto until about June, 1957, after they had been returned to Folsom prison. The information charging them with murder was filed in Jefferson county district court on June 28, 1957.

Defendants were returned to Colorado to stand trial pursuant to extradition procedures as set forth in C.R.S. 1953, 60-1-1, et seq. In habeas corpus proceedings instituted in California the action of the Governor of that state in ordering the return of defendants to Colorado was approved by the Court of Appeals of California, *In re Kostal*, 312 P. (2d) 280. Defendants entered pleas of not guilty and the court set the cause for trial December 2, 1957. November 21, 1957, they escaped from the Jefferson county jail. Watson was recaptured that same evening. Kostal was apprehended in New York City January 10, 1958, at which time an officer attempting to make the arrest suffered a gunshot wound from a gun in the hands of Kostal who was struck in the leg by the same bullet. The wounds were suffered during a scuffle for possession of the gun drawn by Kostal in an effort to avoid arrest.

Trial of the case began on May 13, 1958, and continued for three weeks. The delay of the trial from December 2, 1957, until May 13th of the following year was caused exclusively by the escape of defendants

from the Jefferson county jail, and the argument advanced by counsel for Watson that he was "denied a speedy trial" has no merit whatever.

The robbery culminating in the homicide occurred in the Country Gentleman Store. Five eyewitnesses identified the defendant Kostal as being one of the perpetrators of the crime. Four of these witnesses identified the defendant Watson as being the other bandit. The testimony of these witnesses was substantially in agreement concerning details of the crime, as follows: Watson stood at the side door of the store guarding the witnesses while Kostal was at the front of the store with the witness Tony Archer from whom he demanded the money from the safe. The deceased, a merchant policeman, drove up in front of the store and Kostal shot him in the forehead as he sat behind the wheel of his automobile. The witnesses all agreed that the men had artificially blackened or darkened their faces, though there was some doubt of this at first. Three ballistics experts were called by the people, all of whom testified that the gun found in defendant Kostal's possession when arrested was in fact the gun from which the cartridge, Exhibit D, found at the murder scene, was fired.

The defense testimony consisted of five law enforcement officers who reported the descriptions of the men as obtained from the witnesses soon after the commission of the crime. This testimony was introduced to cast doubt on the witnesses' identification of the two defendants, some of whom described the men as Negroes, some as white men, and one described one of the perpetrators of the crime as having a "light yellow face." The last defense witness was a ballistics expert who contradicted the findings of the people's experts to a certain degree. He agreed the cartridge found at the murder scene had been fired from defendant Kostal's gun. He disagreed with the testimony of the people's witnesses that the bullet jacket

found in the front seat of the decedent's car had been fired from the gun found in Kostal's possession when he was arrested.

Witnesses Sims and Nesbitt, called by the people, testified concerning the arrest of Kostal in Kansas City, Missouri. They took from him the gun which witnesses for the people testified fired the fatal shot. They testified that Kostal told them about his escape from Folsom prison; that he admitted participating in two armed robberies in Kansas City on December 14th and 15th, 1956; that he and a companion burglarized a pawnshop in Los Angeles, California, where he stole the gun which the officers seized at the time of his arrest. The victim of one of the Kansas City robberies identified Kostal and Watson as the men who robbed him on the night of December 14, 1956, at his place of business. The witness, Lightner, called by the people, testified to a conversation with defendant Watson on January 18, 1957, concerning his escape from Folsom prison. Watson told him about breaking into the pawnshop in Los Angeles where guns were taken. The pistol taken from him in Detroit was stolen in that burglary. Other testimony was received, from which it appears that the defendants stole automobiles in Sacramento and Los Angeles, California, following their escape from prison.

Following the Jefferson county killing, the evidence shows that defendants stole two Mercury automobiles in Denver and each defendant had one of them when arrested. All of the above mentioned acts not directly connected with the robbery and homicide in Jefferson county were admitted over objection of counsel for defendants.

With reference to the escape from the Jefferson county jail a few days before the case was to have been tried pursuant to the original setting, evidence was admitted which established facts as follows:

Kostal drew a gun on a deputy sheriff who was

acting as jailer, took the keys to the jail away from him, bound and gagged him and then went with Watson to the office where they encountered a lawyer seeking an interview with a client in custody. They locked the lawyer in a closet. Defendants then went to the nearby residence of Mr. and Mrs. Kelley and invaded their home at gunpoint, took $25.00 from Mr. Kelley, threatened to take him with them, forced him to give them keys to his automobile, ripped the telephone from the wall and left in the Kelley automobile. Shortly thereafter police picked up the trail and followed the Kelley car being driven by one of the defendants while the other defendant fired shots at the pursuing officers. Defendants wrecked the stolen car in their effort to escape, and fled the scene on foot. Watson was apprehended shortly thereafter. Kostal got away and was arrested in New York City as above stated.

No witness testified that either Watson or Kostal made any statement which could be construed as an admission of guilt concerning the charge contained in the information. All the statements made by either of the defendants received in evidence, related to acts which were not a part of the offense for the commission of which they were on trial. The conversations thus received were had at a time when neither defendant had been connected in any manner as a participant in the Jefferson county offense, and no reference to it was made by the officers who interrogated them.

In one way or another the trial court admitted evidence during the people's case in chief which tended to prove that between the dates of November 1, 1956, and December 16, 1956, defendants had:

1. Escaped from Folsom prison in the State of California where they had been confined as convicts.

2. Stolen a car in Sacramento, California, and driven it to Los Angeles.

3. Stolen a Mercury automobile in Los Angeles which they drove to Colorado.

4. Committed a burglary in Los Angeles and stolen some guns.

5. Committed a burglary of an automobile agency in Lakewood, Colorado, and had stolen two automobiles from the premises. As already indicated, this took place on the day of the homicide.

6. Committed an armed robbery of the proprietor of a grocery and market in Kansas City, Missouri.

7. Committed an armed robbery of the operator of a tavern in Kansas City, Mo.

To all of this testimony, timely and pertinent objections were made.

The question we are first called upon to answer is whether the evidence above referred to was properly admitted. That question must be, and is, answered in the negative. This is true with reference to all the above acts except as to the theft of the two cars in Lakewood which occurred on the day of the offense charged in the information, and might well have been a part of a plan to escape following the contemplated robbery which resulted in the homicide.

The applicable rule of law which compels a reversal of this judgment was stated by this court in the early case of *Warford et al. v. People,* 43 Colo. 107, 96 Pac. 556, as follows:

"The general rule is, that evidence is not admissible which shows, or tends to show, that the accused has committed a crime wholly independent of the offense for which he is on trial. The reason for the rule is, that no person shall be convicted of an offense by proving that he is guilty of another. Evidence of such character creates a prejudice in the minds of the jury against the accused, *and the rule should, therefore, be strictly enforced in all cases where applicable.* * * * " (Emphasis supplied.)

The case of *Webb v. People,* 97 Colo. 262, 49 P. (2d)

381, bears marked similarity in many particulars to the instant case. There the defendant was accused of an assault to commit robbery upon one Morris Miller on September 15, 1934. The trial court admitted evidence, over the objection of defendant's counsel, that Webb had participated in a robbery committed upon one Blodheim on September 8, 1934. In holding the reception of this evidence to be reversible error the court pointed out that aside from the fact that Webb was stated to be one of two men who were said to have participated in the crimes, there was no similarity between the crimes. We quote from that opinion the following pertinent language:

" * * * In other words, the earlier supposedly similar offense was entirely independent of the later one and disconnected therefrom. They were separated by a full week of time, they were perpetrated within the most populous city of Colorado in two distinct and separate places, the manner of their commission was utterly different in the first instance from the second, and the two victims were strangers to each other. * * * "

In the case at bar most of the "offenses" which were paraded before the jury under the guise of "similar offenses" (to establish intent, design or plan to produce a result of which the act charged in the information was a part) were not robbery cases and were thus wholly dissimilar to the acts in which defendants were allegedly engaged when the homicide was committed. In the Webb case, evidence of a single alleged "similar offense" committed in the identical city one week prior to the crime charged in the information, was held to be error and to require a re-trial of the cause. In the case at bar it cannot be held that the evidence in question was properly admitted, showing as it does, numerous crimes wholly dissimilar in nature including two alleged robberies committed hundreds of miles removed from the scene of the crime for which defendants were on trial.

A guide to prosecuting attorneys and trial courts in resolving the question of whether evidence of "similar offenses" is competent under any exception to the rule hereinabove stated which requires its exclusion, will be found at page 265 of the opinion in *Webb v. People,* supra, where a quotation from *Commonwealth v. Ferrigan,* 44 Pa. St. 386, appears as follows:

"Where the facts and circumstances offered in evidence amount to proof of a crime other than that charged, and there is ground to believe that the crime charged grew out of it, or was caused by it, such facts and circumstances may be admitted to show the *quo animo* of the accused."

The following additional quotation from the Webb case is fully applicable to the instant case:

"In the case at bar the district attorney offered the evidence of the alleged similar offense for the purpose, as he expressed it, 'of showing intent to commit robbery, and for that purpose only.' It was thereupon admitted, over the defendant's objection, but limited to the special purpose stated. It is at once apparent, by even a casual comparison, that this is not a case in which such evidence could possibly have a proper bearing on the question of intent. There is no logical connection conceivable between the two independent offenses. The situation is clearly distinguishable from those in various cases cited by the people, where we have sustained the admission of similar-offense evidence under the exceptions above noted; and a further discussion of them is unnecessary. The admission of such evidence in the present instance was reversible error."

Other well considered cases supporting this view on the question are *Jaynes v. People,* 44 Colo. 535, 99 Pac. 325; *Cargill v. People,* 73 Colo. 218, 214 Pac. 387; *Wood v. People,* 60 Colo. 211, 151 Pac. 941; *Munfrada v. People,* 99 Colo. 80, 60 P. (2d) 223.

We cannot conclude a discussion of this question

without referring to the opinion of this court in *Stull v. People,* 140 Colo. 278, 344 P. (2d) 455, where the most recent expression of this court on the question appears. The opinion in that case if followed by trial courts will go far to avoid reversals of judgments in criminal cases involving alleged "similar offenses."

We come now to a consideration of the evidence relating to the escape of defendants from the Jefferson county jail. Nine witnesses were called and gave testimony concerning the events which took place at the time defendants made their escape from the jail, the chase that followed, and the subsequent arrest of Kostal in New York City. Witnesses Surratt, Puckett, Gerrity, Tolan, John Kelley, Julia Kelley, Danks, Shangnessy, and Robinson were called. Robinson, Surratt and Puckett testified to happenings inside the Jefferson county jail including threats and pointing of guns, while Mr. and Mrs. Kelley testified to having their home invaded at gunpoint at night and their car and money being taken. Danks and Shangnessy testified to a running gun battle, an automobile chase through Denver streets; and Tolan and Gerrity testified to a gun battle in Times Square in New York City, and the wounding of defendant Kostal and witness Gerrity.

This evidence was admitted by the trial court under the general rule of law set forth in 20 Amer. Jur. 276, section 298, as follows:

"Evidence of the escape and flight of a person charged with a crime, from jail or the custody of an officer, or of his attempt to escape is competent, in connection with other facts and circumstances, on the question of his guilt, nothwithstanding it has only slight tendency to prove guilt, * * *."

This general rule was approved by this court in *Bernard v. People,* 124 Colo. 424, 238 P. (2d) 852. It is contended, however, that the Bernard case is not in point because there the accused was held on one offense only and there could be no doubt that he attempted to escape

from prosecution on the identical charge involved in the action. It is said by counsel for defendants in the instant case:

"Here, however, the defendants were facing other charges, * * * Who can say whether it [the escape] was motivated by a desire to avoid serving a penitentiary sentence in California, * * * to avoid prosecution for a holdup in Kansas City, or to avoid a prosecution for stealing cars in Los Angeles?"

Counsel contend that the evidence of escape has no probative value under these circumstances.

Suffice it to say that the defendants made statements to the lawyer they locked in the closet in the sheriff's office, and to the Kelleys when they invaded their home at gunpoint, in which they made it perfectly clear that they were fleeing from a murder prosecution. These statements alone were sufficient to bring the case within the doctrine of *Bernard v. People,* supra. The court did not err in receiving the evidence relating to the escape of defendants, and the subsequent arrest of Kostal in New York City.

Other points argued for reversal of the judgment are without merit or are so unlikely to recur upon a retrial that we do not mention them in this opinion.

The judgment is reversed and the cause remanded with directions to grant a new trial.